UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 19-01227-5-JNC |
| CAH ACQUISITION COMPANY 16, LLC, | ) | |
| d/b/a HASKELL COUNTY COMMUNITY | ) | Chapter 11 |
| HOSPITAL, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**TRUSTEE'S MOTION FOR AUTHORITY TO (1) REJECT CERTAIN EXECUTORY CONTRACTS WITH iHEALTHCARE MANAGEMENT II COMPANY AND iHEALTHCARE SOFTWARE SERVICES, INC.; (2) ENTER INTO INTERIM MANAGEMENT AGREEMENT WITH COHESIVE HEALTHCARE MANAGEMENT & CONSULTING LLC; AND (3) PROVIDE COHESIVE HEALTHCARE MANAGEMENT & CONSULTING LLC WITH AN ALLOWED ADMINISTRATIVE CLAIM IN THE AMOUNT OF $497,790.14 FOR CERTAIN EXPENSES INCURRED TO PRESERVE AND MAINTAIN THE DEBTOR'S ESTATE**

**NOW COMES** Thomas W. Waldrep, Jr., trustee (the "Trustee") for CAH Acquisition

Company 16, LLC d/b/a Haskell County Community Hospital (the "Debtor"), by and through his

undersigned counsel, and pursuant to Sections 363, 365, 503, 543 and 1107 of Title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 6004 and 6006

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby moves the Court

for entry of an Order authorizing the Trustee to: (i) reject certain pre-petition executory contracts

between the Debtor, iHealthcare Management II Company, a Florida corporation ("Manager"),

and iHealthcare Software Services, Inc., a Florida corporation ("Consultant")[1]; (ii) enter into an

*Interim Management Agreement for Haskell County Community Hospital* (the "Interim

Management Agreement") between the Debtor and Cohesive Healthcare Management &

Consulting LLC ("Cohesive"); and (iii) provide Cohesive with an allowed administrative claim

---

[1] Manager and Consultant shall hereinafter be referred to collectively as "iHealthcare."

1

under Section 503 of the Bankruptcy Code in the amount of $497,790.14 for certain expenses incurred by Cohesive to preserve and maintain the Debtor's estate. In support thereof, the Trustee respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to entertain the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Sections 363, 365, 503, 543 and 1107 of the Bankruptcy Code, and Bankruptcy Rules 6004 and 6006.

## FACTUAL BACKGROUND

### Procedural Background

4.      On March 17, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court.

5.      On March 18, 2019, the Court entered an Order approving the appointment of the Trustee.  The Trustee is the duly appointed, qualified, and acting trustee of the Debtor's estate.

6.      The Debtor operates Haskell County Community Hospital ("Haskell"), a twenty-five-bed, for-profit, Critical Access Hospital in Stigler, Oklahoma.  Haskell provides acute care, swing bed, emergency medicine, radiology, physical rehabilitation, laboratory, skilled nursing, and related outpatient ancillary services to residents in Stigler and in surrounding communities. Haskell also operates the Specialty Clinic of Stigler (the "Clinic").  The Clinic is adjacent to Haskell.

7.     Upon information and belief, the Debtor is currently owned by HMC/CAH Consolidated, Inc. ("HMC") (20% interest) and Health Acquisition Company, LLC ("HAC," and together with HMC, the "Owners") (80% interest).  Upon information and belief, the Owners are in the business of acquiring and operating a system of acute care hospitals located in rural communities that are certified by The Centers for Medicare and Medicaid Services ("CMS") as Critical Access Hospitals.  Upon information and belief, the Owners own and/or operate rural hospitals in several states, including Kansas, North Carolina, Missouri, Tennessee, and Oklahoma.

### *Pre-Petition Management of Haskell*

8.     Upon information and belief, through and until January 7, 2019, EmpowerHMS LLC ("EmpowerHMS") managed Haskell under one or more contracts with the Debtor. EmpowerHMS is a Delaware limited liability company headquartered in Kansas City, Kansas. Upon information and belief, EmpowerHMS formerly provided the financial support, legal support, centralized business office, and revenue cycle and IT services necessary to Haskell's operations.

9.     Upon information and belief, as of January 7, 2019, EmpowerHMS no longer operated or managed Haskell, the management of which was transferred by EmpowerHMS to iHealthcare pursuant to (i) a *Management and Administrative Services Agreement* (the "Terminating Management Agreement") dated as of January 7, 2019, by and between the Debtor and Manager; (ii) an *EHR and RCM Services Agreement* dated as of January 7, 2019 by and between the Debtor and Consultant; and (iii) an *IT Help Desk Support & Daily Backup Services Agreement* also dated as of January 7, 2019 by and between the Debtor and Consultant (together with the *EHR and RCM Services Agreement*, collectively, the "Terminating Services Agreements").

10.      Upon information and belief, after January 7, 2019, iHealthcare attempted to begin managing Haskell, but such efforts were delayed by a number of transition and financial issues with EmpowerHMS.

11.      On or around March 11, 2019 (the "Receivership Date"), Cohesive was appointed as receiver by an Oklahoma state court to manage Haskell.

12.      In its capacity as court-appointed receiver, between the Receivership Date and the Petition Date, Cohesive maintained Haskell in an operational status and spent significant financial and human resources in maintaining and preserving the Debtor's estate.

13.      Between the Receivership Date and the Petition Date, Cohesive provided operating capital to Haskell in the amount of $159,292.30 to preserve Haskell's operations (the "Pre-Petition Advances"). A breakdown of the Pre-Petition Advances is attached hereto as Exhibit A. The Pre-Petition Advances were provided by Cohesive to pay several categories of expenses, including wages and salaries of Haskell employees, payments into employee benefit plans, medical inventory, and physical facility supplies, all of which were necessary to maintain Haskell as a going concern and thus to preserve the value of Haskell for creditors and all other parties in interest in this case.

### Post-Petition Events

14.      As was the case Pre-Petition, Cohesive continued to maintain Haskell in an operational status Post-Petition and continued to provide operating capital to Haskell Post-Petition to cover expenses on behalf of Haskell (the "Post-Petition Advances"). The Post-Petition Advances amount to $337,497.84. A breakdown of the Post-Petition Advances is attached hereto as Exhibit A. Without either the Pre-Petition Advances or the Post-Petition Advances, the Trustee

does not believe that Haskell could have operated following the Receivership Date or the Petition Date.

15.     Since his appointment on March 18, 2019, the Trustee has been administering the estate of the Debtor, as well as the seven other affiliated debtors in bankruptcy cases currently pending before this Court (collectively, the "Affiliated Debtors"). See *Order Directing Joint Administration of Chapter 11 Cases*, Case No. 19-00730, Dkt. No. 75.

16.     The Trustee has concluded that in order to preserve the property of the Debtor's estate, to prevent further loss to the estate, and to maximize the value of the assets of Haskell for the benefits of creditors of the Debtor, Haskell must be maintained in a healthy operational status. Haskell must keep its license as a Critical Access Hospital; preserve and maintain its drugs, equipment, and supplies; preserve and safeguard patient records; and, most importantly, continue providing for the public health of residents of the Stigler, Oklahoma area, many of whom depend on Haskell and the Clinic as the only avenue for emergency healthcare.

### *Future Management of Haskell*

17.     In order to operate Haskell, in the most cost-efficient manner, the Trustee must retain a healthcare management company that is able to provide the centralized business office, revenue cycle management, billing, patient record, patient intake, and IT services necessary to Haskell's operations. In traditional "healthy" hospital settings, such management agreements can run well into the hundreds of thousands of dollars per month.

18.     The Trustee has reviewed the Terminating Management Agreement and Terminating Services Agreement with iHealthcare and concluded that such agreements are not appropriate to deal with the current, post-petition situation at Haskell.  As such, the Trustee seeks Court authority to terminate these contracts with iHealthcare as of the Petition Date.

19.    Recognizing the truly distressed setting of Haskell, coupled with the fact that the Trustee does not have an unlimited budget or timeline in this case, the Trustee has concluded, in his business judgment and after considering several proposals from functionally-similar healthcare management companies, that Cohesive offers the best feasible option for managing Haskell, on an interim basis, until the operations of Haskell are properly stabilized. Additionally, Cohesive's current familiarity with Haskell reduces the timeline and cost of engaging a manager for this particular hospital.

20.    The Trustee has negotiated the Interim Management Agreement with Cohesive that (i) recognizes the Trustee's authority over all of Haskell's decisions, management, and operations and (ii) proposes a feasible, discounted fee structure that acknowledges the financially distressed condition of Haskell. The proposed Interim Management Agreement is attached hereto as Exhibit B.

21.    The key terms of the Interim Management Agreement are as follows:

a.    Term: Five (5) years, but subject to a 30-day termination for any reason by the Trustee or by Cohesive.

b.    Management Fee: $225,000 per month, which shall be paid as follows: $40,000 on or before the 1st of each month (to be prorated during the month of the Effective Date with such prorated amount being paid within three (3) days of the Effective Date) and the remainder to be paid from Haskell's receipt of the components of the Management Fee from whatever source received.   In addition, Cohesive shall be entitled to a seven percent (7%) fee of Haskell's receipts for its performance of revenue cycle management functions on behalf

of Haskell.  Cohesive shall also be entitled to be paid for staffing services at cost plus twenty percent (20%) from Haskell's receipts.

c.  <u>Management Services</u>: Cohesive shall perform all the duties that are typical and customary for a manager of an acute general medical and surgical hospital, as outlined in detail in the Interim Management Agreement.

d.  <u>Reports</u>: Cohesive shall provide Trustee with regular and timely written management reports, as needed, to ensure Haskell maintains compliance with all federal and state law regulations, and with any relevant bankruptcy issues.

e.  <u>Limitations on Cohesive's Duties and Powers</u>: Cohesive lacks the authority to carry out any decisions out of the ordinary course of business unless with prior written authority by the Trustee.

f.  <u>Termination</u>: Trustee or Cohesive may terminate the Interim Management Agreement for any reason upon providing thirty (30) days' written notice to the other party.

**RELIEF REQUESTED**

***Authority to Reject Terminating Management Agreement and Terminating Services Agreement***

22.  The Trustee seeks authority from this Court, pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, to reject the Terminating Management Agreement and Terminating Services Agreements, both executory contracts, because these contracts (i) are no longer necessary or appropriate in connection with the operation of Haskell's business, (ii) offer no economic value to the Debtor's estate, and (iii) will impede the goal of reopening Haskell without a significant fee associated with such management contracts.

23.     Section 365(a)  authorizes a trustee or debtor-in-possession to reject any executory contract or unexpired lease, subject to bankruptcy court approval. 11 U.S.C. § 365(a).

24.     Although Section 365(a) does not provide a standard for determining when rejection is appropriate, bankruptcy courts have traditionally applied the "business judgment standard in determining whether to permit the rejection of any executory contract or unexpired lease."  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Lubrizol Enters., Inc. v. Richmond Metal Finishes, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985); In re Minges, 602 F. 2d 38, 42 (2d Cir. 1979).  The decision to reject a lease or executory contract is to be accepted unless it is shown that the debtor's decision was one taken in bad faith or in gross abuse of the debtor's retained business discretion.  Lubrizol, supra.

25.     For the reasons stated herein, the Trustee submits that he has satisfied the business judgment standard in seeking rejection of the Terminating Management Agreement and Terminating Services Agreement with iHealthcare, and requests authority from this Court to do so effective as of the Petition Date.

### *Authority to Enter into Interim Management Agreement*

26.     The Trustee seeks authority from this Court, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004, to enter into the Interim Management Agreement with Cohesive.

27.     Section 363(b) authorizes a trustee or debtor-in-possession to use, sell, or lease property of the estate other than in the ordinary course of business, subject to notice, a hearing, and bankruptcy court approval. 11 U.S.C. § 363(b).

28.    The Trustee seeks authority to enter into the Interim Management Agreement with Cohesive so that Cohesive can provide management services to Haskell, on an interim basis, until Haskell's operations are properly stabilized.

29.    The Trustee believes Cohesive is best suited to provide such management services given that Cohesive (i) was already serving as the management company for Haskell and one of the Affiliated Debtors (CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital) prior to the Petition Date, and is thus familiar with the specific obstacles faced by Critical Access Hospital facilities in rural Oklahoma; (ii) already has access to all of the software, patient records, billing records, and administrative records of Haskell; (iii) has agreed to the terms of the Interim Management Agreement that recognize the truly distressed nature of Haskell with regard to management fees and management services; and (iv) is willing and able to undertake the management tasks at Haskell without significant delay or immediate expenditure by the Debtor's estate.

30.    Notably, the Trustee seeks to employ Cohesive in an identical capacity, as interim manager, in three of the Affiliated Debtors' cases: (i) CAH Acquisition Company #4, Inc. d/b/a Drumright Regional Hospital; (ii) CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital; and (iii) CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital. This unity of management will provide substantial administrative and economic benefits to each of the respective debtors' estates.

31.    Therefore, the Trustee believes it is in the best interests of the Debtor's estate to enter into the Interim Management Agreement with Cohesive for the management of Haskell on an interim basis.

**_Authority to Provide Cohesive an Allowed Administrative Claim in the Amount of $497,790.14 for the Pre-Petition Advances and Post-Petition Advances_**

32.     Finally, the Trustee moves the Court for entry of an Order providing Cohesive with an allowed administrative claim under Section 503 of the Bankruptcy Code for the Pre-Petition Advances and Post-Petition Advances funded by Cohesive to preserve and maintain the Debtor's Estate.

33.     Section 543(c)(2) of the Bankruptcy Code authorizes the payment—subject to notice, a hearing, and bankruptcy court approval —of reasonable compensation for services rendered and costs and expenses incurred by a custodian appointed before a bankruptcy case who held property of a debtor's estate. 11 U.S.C. § 543(c)(2). Relatedly, Section 503(b)(3)(E) of the Bankruptcy Code authorizes the payment, as an administrative expense, of the actual, necessary expenses (other than legal or accounting fees) incurred by a custodian who is superseded by a trustee in bankruptcy. 11 U.S.C. § 503(b)(3)(E).

34.     Section 503(b)(1)(A) of the Bankruptcy Code authorizes the payment of an administrative expense—subject to notice, a hearing, and bankruptcy court approval—incurred by an entity for the actual and necessary costs and expenses of preserving the estate.  11 U.S.C. § 503(b)(1)(A). Additionally, Section 503(b)(3)(D) of the Bankruptcy Code authorizes the payment of an administrative expense to a creditor that has made a substantial contribution to in a case under Chapter 9 or 11 of the Bankruptcy Code.  11 U.S.C. § 503(b)(3)(D).

35.     The Trustee believes that both the Pre-Petition Advances and the Post-Petition Advances by Cohesive not only preserved and maintained the Debtor's estate, but also were a substantial contribution to the Debtor's Chapter 11 case. Significantly, these advances provided by Cohesive allowed Haskell to continue operations after both the Receivership Date and the Petition Date and therefore reduced—or completely eliminated—any costs to the Debtor's estate

related to the resumption of operations at Haskell. Therefore, the Trustee moves the Court to provide Cohesive with an allowed administrative claim under Section 503 of the Bankruptcy Code for the Pre-Petition Advances and Post-Petition Advances, which total $497,790.14 (the "Cohesive Administrative Claim").

36.     The Trustee further requests authority from the Court to pay Cohesive the amount of the Post-Petition Advances ($337,497.84) immediately upon entry of the Order allowing the Cohesive Administrative Claim. The balance of the Cohesive Administrative Claim, the Pre-Petition Advances ($159,292.30) shall not be paid immediately, but shall remain as an administrative priority claim to be paid later in the case.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.     Authorizing the Trustee to reject the Terminating Management Agreement and Terminating Services Agreement effective as of the Petition Date, pursuant to Section 365(a) of the Bankruptcy Code;

2.     Authorizing the Trustee to enter into the Interim Management Agreement, pursuant to Section 363(b) of the Bankruptcy Code;

3.     Providing Cohesive with an allowed administrative claim under Section 503 of the Bankruptcy Code for the Pre-Petition Advances and Post-Petition Advances, which total $497,790.14;

4.     Authorizing the Trustee to pay the amount of the Post-Petition Advances ($337,497.84) immediately upon entry of the Order allowing the Cohesive Administrative Claim; and

5.     Granting such other and further relief as this Court deems just and proper.

11

Respectfully submitted, this the 22nd day of April, 2019.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
  Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
  Jennifer B. Lyday (NC Bar No. 39871)
  Francisco T. Morales (NC Bar No. 43079)
  101 S. Stratford Road, Suite 210
  Winston-Salem, NC 27104
  Telephone: 336-717-1440
  Telefax: 336-717-1340
  Email: notice@waldrepllp.com

**- and –**


**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: khendren@hendrenmalone.com
       rredwine@hendrenmalone.com

*Proposed Attorneys for the Trustee*

**EXHIBIT A**

**Haskell County Community Hospital**

| Description | Date | Amount |
|---|---|---|
| WIRE TRANSFER FROM COHESIVE - Payroll | 3/13/19 | 150,000.00 |
| CREDIT CARD - BECKMAN COULTIER LAB | 3/13/19 | 2,280.72 |
| CREDIT CARD - CLIA LAB | 3/14/19 | 1,550.00 |
| CREDIT CARD - MCKESSON | 3/17/19 | $341.69 |
| CREDIT CARD - BECKMAN COULTIER LAB | 3/17/19 | $30.25 |
| CREDIT CARD - LAB SUPPLIES | 3/13/19 | $2,121.86 |
| CREDIT CARD - BECKMAN COULTIER LAB | 3/17/19 | $467.78 |
| PHARMACY ADVANCED FROM PAWHUSKA HOSPITAL | 3/17/19 | 2,500.00 |
| **TOTAL TRANSFERS FROM COHESIVE PRIOR TO BANKRUPTCY** | | 159,292.30 |
| | | |
| CREDIT CARD - GO DADDY | 3/18/19 | $479.13 |
| CREDIT CARD - BECKMAN COULTIER LAB | 3/18/19 | $57.37 |
| CREDIT CARD - MCKESSON | 3/24/19 | 201.52 |
| CREDIT CARD - MCKESSON | 3/27/19 | 632.98 |
| WIRE TRANSFER FROM COHESIVE - Payroll | 3/28/19 | 112,000.00 |
| CREDIT CARD - MCKESSON | 3/31/19 | 1,148.08 |
| CREDIT CARD - OFFICE DEPOT | 4/1/19 | 170.05 |
| CREDIT CARD - CT SCANNER | 4/8/19 | 5,800.00 |
| CREDIT CARD - OFFICE DEPOT | 4/1/19 | 276.98 |
| CREDIT CARD - OFFICE DEPOT | 4/1/19 | 271.57 |
| CREDIT CARD - OFFICE DEPOT | 4/1/19 | 52.68 |
| CREDIT CARD - OFFICE DEPOT | 4/1/19 | 12.64 |
| Cloud Services LLC - IT | 4/9/19 | 159.00 |
| Alpha Card - IT | 4/10/19 | 1,194.43 |
| CREDIT CARD - BECKMAN COULTIER LAB | 4/14/19 | 3,305.26 |
| CREDIT CARD - BECKMAN COULTIER LAB | 4/14/19 | 2,371.64 |
| CREDIT CARD - BECKMAN COULTIER LAB | 4/14/19 | 825.90 |
| CREDIT CARD - BECKMAN COULTIER LAB | 4/16/19 | 249.75 |
| WIRE TRANSFER FROM COHESIVE - Payroll | 4/11/19 | 20,000.00 |
| WIRE TRANSFER FROM COHESIVE - Payroll | 4/12/19 | 188,288.86 |
| **TOTAL TRANSFERS FROM COHESIVE AFTER BANKRUPTCY** | | 337,497.84 |

**EXHIBIT B**

**INTERIM MANAGEMENT AND HOSPITAL SERVICES AGREEMENT**

**by and between**

**COHESIVE HEALTHCARE MANAGEMENT & CONSULTING LLC**

**and**

**CAH ACQUISITION COMPANY 16, LLC, DEBTOR IN**

**CASE NO 19-01227-5-JNC, UNITED STATES BANKRUPTCY COURT**

**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

**INTERIM MANAGEMENT AND HOSPITAL SERVICES AGREEMENT**

THIS INTERIM MANAGEMENT AND HOSPITAL SERVICES AGREEMENT (the "**Agreement**") is made and entered into on the _____ day of _____, 2019 (the "**Effective Date**") by and between the following parties:

(i) **Thomas W. Waldrep, Jr.**, in his capacity as the Court-appointed trustee (the "**Trustee**") for **CAH Acquisition Company 16, LLC** (the "**Owner**"), a Delaware limited liability company that owns, operates, and holds the license for that certain acute general medical and surgical hospital known as *Haskell County Community Hospital* located at 401 NW H Street, Stigler, Oklahoma 74462 (the "**Hospital**"); and

(ii) Cohesive Healthcare Management & Consulting LLC, an Oklahoma limited liability company (the "**Manager**").

The Trustee, Owner, and Manager are sometimes referred to herein individually as a "Party" or collectively as the "Parties."

## RECITALS

WHEREAS, Owner is currently a Chapter 11 debtor in a bankruptcy case pending before the United States Bankruptcy Court for the Eastern District of North Carolina, Greenville Division (the "**Bankruptcy Court**") styled *In re CAH Acquisition Company 16, LLC, d/b/a Haskell Community Hospital*, Case No. 19-01227-5-JNC, which bankruptcy case is being jointly administered with a bankruptcy case styled *In re CAH Acquisition Company #1, LLC d/b/a Washington County Hospital*, Case No. 19-00730-5-JNC (the "**Bankruptcy Case**");

WHEREAS, Thomas W. Waldrep, Jr., is the duly appointed and acting Chapter 11 Trustee in the Bankruptcy Case;

WHEREAS, the Trustee desires to engage the Manager to manage the Hospital, on an interim basis, under the terms of this Agreement;

WHEREAS, the Parties agree that this Agreement is subject to the approval of the Bankruptcy Court, which approval the Trustee agrees to promptly seek; and

WHEREAS, the Manager has expertise in providing hospital management services to hospitals and desires to provide such services to the Hospital under this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and conditions herein stated and in consideration of the mutual benefits that will accrue to each of the Parties, the Parties have agreed and do hereby agree as follows:

## ARTICLE I – DEFINITIONS

Section 1. Definitions.          For the purposes of this Agreement, the following terms have the meanings provided for in this Section 1, unless the context clearly requires otherwise:

**Affiliate**: Any person or entity that controls, is controlled by, or is under common control with a Party, including any director, officer, principal, shareholder, or equity owner of a Party, and any subsidiary, parent, or other organization in which a Party or any director, officer, principal, shareholder, or equity owner of a Party owns any interest or maintains any financial relationship, including any equity or debt investment and compensation arrangement.  "Affiliate" also includes the parent company-subsidiary relationship.

**Agreement**: This Management Services Agreement, together with all schedules and exhibits attached hereto, each of which are incorporated herein as an integral part of this Agreement.

**Annual Plan**: A narrative report of Manager's major management goals and intended actions for the appropriate Operating Year approved by the Trustee.

**Capital Expenditure:** All expenditures for building additions, alterations, repairs, or improvements and for purchases of additional or replacement furniture, machinery, or equipment, where the cost of such expenditure is equal to or greater than Five Thousand Dollars ($5,000.00) and the depreciable life of the applicable item, according to generally accepted accounting principles, is in excess of five (5) years.

**Capital Plan**: A schedule of proposed Capital Expenditures to be made for the purpose of allowing the Trustee to consider such Capital Expenditures and to prepare and update a long-term capital investment budget.

**Confidential Information**: All Patient Files, all Documentation, including all information contained therein or derived therefrom, and any trade secrets, propriety business techniques, or confidential information of a disclosing Party, including information disclosed by a Party to the other or learned by a receiving Party as a result of its access to any personnel, systems, data, files, documents, offices, property, or personnel of the disclosing Party. A disclosing party's Confidential Information shall not include information that:

1. Is or becomes a part of the public domain through no act or omission of the receiving Party;
2. Was in the receiving Party's lawful possession prior to the time such information was disclosed to or learned by the receiving Party from or by access to the disclosing Party, and at the time of such prior possession the receiving Party was not under a duty of confidentiality to the disclosing Party with respect thereto;
3. Is lawfully disclosed to the receiving Party by a third party without restriction imposed by the third party on the receiving Party's further disclosure of such information; or
4. Is independently developed by the receiving Party by its personnel not having access to such Confidential Information.

**CPI**: The "Consumer Price Index" for the area in which the Hospital is physically located as published by the United States Department of Labor's Bureau of Labor Statistics, or such other successor or similar index.

**Documentation**: Technical, policy, procedural, and administrative manuals, training materials, standard report forms, and other materials that contain information regarding the operation and management of the Hospital together with the information contained therein and derived therefrom.

**Dispute**: Any claim, controversy, or dispute arising out of or relating to this Agreement.

**Executive Personnel:** All employees, agents, and independent contractors employed by the Manager pursuant to Section 11 of this Agreement.

**Effective Date**: As defined in the opening paragraph of this Agreement, which is the date on which the Bankruptcy Court entered an Order approving this Agreement.

**Event of Force Majeure:** An act of God, fire, earthquake, hurricane, flood, riot, civil commotion, terrorist act, terrorist threat, storm, washout, wind, lightning, landslide, explosion, epidemic, inability to obtain materials or supplies, accident to machinery or equipment, any law, ordinance, rule, regulation, or order of any public or military authority steaming from the existence of economic or energy controls, hostilities or war, a labor dispute that results in a strike or work stoppage affecting the Trustee or the Manager, or any other cause or occurrence outside of the reasonable control of the Party claiming an inability to perform and which by the exercise of due diligence could not be reasonably prevented or overcome.

**Federal Health Care Program:**  As defined in 42 USC § 1320(a)-7b(f), any plan or program that provides health benefits, whether directly, through insurance, or otherwise, that is funded, in whole or in part, by the United States government, including the following: Medicare Program, Parts A & B (including Medicare as a secondary payer); Medicare Advantage Program (also called "Medicare Replacements" or Medicare Part C); Medicaid; Federal Prison Hospitals; Indian Health Service; FECA and OWCP (workers' compensation programs for federal employees); Public Health Service; Railroad Retirement Board; The Black Lung Program; TRICARE/CHAMPUS/Department of Defense Health Care Programs; and Veterans Administration.

**Jeopardy Issue**: Any of the following with respect to a Party: (a) loss of any licensure; (b) exclusion of the Party, or any of its respective owners or principals, from any Federal Health Care Program, loss of participation in, or the payment or reimbursement from, Medicare; (c) loss of full accreditation by any state or nationally recognized accrediting organization; (d) loss of, or sanctions with respect to, the federal tax-exempt status of the Owner or its Affiliates under Section 501(c)(3) of the Internal Revenue Code, as amended from time to time; (e) loss of the Hospital's status a critical access hospital under Section 1820 of the federal Social Security Act; (f) a violation of any Law that is applicable to either Party or this Agreement, the violation of which substantially impairs the viability or fundamental purpose of this Agreement, whether or not, in the case of a change in Law, such change has become effective.

**Law**: All applicable federal, state, and local laws, ordinances, court decisions and orders, rules, and regulations.

**Management Fee**:  The monthly fee the Owner shall pay to the Manager under this Agreement, as more fully described this Agreement.

**Management Services**: As defined in Section 3 of this Agreement.

**Manager's Mark**: The Manager's logo in the form, both print and electronic, that the Manager will provide to the Owner for use by the Hospital.

**Medicare**: The federal Medicare program administered by the United States Department of Health and Human Services Centers for Medicare and Medicaid Services, or successor organization.

**Non-Executive Personnel:** All employees, agents, and independent contractors employed or retained by the Hospital who are not classified as Executive Personnel.  Non-Executive Personnel may be employed by entities other than the Owner, including by staffing agencies.

**Operating Accounts**: Such interest-bearing bank or other deposit accounts established for control of the flow of funds received and disbursed in the operation of the Hospital under this Agreement.

**Operating Expenses**: All expenses incurred in connection with the operation of the Hospital under this Agreement; provided, however, that the term "Operating Expenses" shall not include any of the Owner's repayment obligations to CMS or to any other third-party payor.

**Operating Year**: The Operating Year for the Hospital shall coincide with the Owner's current cost reporting year.

**Patient Files**: All files, charts and records, including medical records and financial records, of all patients of the Hospital.

**Reimbursable Expenses**: Actual, reasonable, verifiable, out-of-pocket, business expenses incurred by the Manager in connection with the performance of the Manager's obligations under this Agreement and in furtherance of the business of the Hospital, such as business travel, meals and incidental expenses, but not costs or expenses related to engaging consultants, subcontracting for services, or any other activities that are contemplated to be performed by the Manager under this Agreement.

**Annual Budget**: A line item budget proposed by the Manager and approved by the Trustee for the operation of the Hospital on an annual basis.

**Trustee**:  Thomas W. Waldrep, Jr., the Court-appointed Trustee in the Bankruptcy Case.

**Term**: As defined in Section 8 of this Agreement.

**Termination Date**: The date on which a terminating Party effectively terminates this Agreement in accordance with its terms.

# ARTICLE II – SERVICES

## Section 2. Engagement.

A. The Trustee, in recognition of the experience of the Manager, hereby engages the Manager to manage and operate the Hospital on behalf of the Trustee.

B. The Manager hereby accepts such engagement, and shall perform the services described herein, subject to the limitations expressly set forth in this Agreement, as an independent contractor of the Owner.

C. The Manager shall not engage in any business activity that unreasonably and substantially interferes with its ability to discharge its duties under this Agreement or is contrary to the interests of the Owner.

## Section 3. Services Performed.

A. The Manager agrees, subject to the budgetary limitations listed in any applicable orders of the Bankruptcy Court, to manage and operate the Hospital by providing the Management Services described in **Exhibit A** hereto. The Manager shall also provide staffing services to the Hospital. The Manager shall also arrange for its affiliate, Cohesive RevOps Integration Management LLC, to provide revenue operation services to the Hospital.

B. The Manager shall provide the Management Services by acting in good faith and in a manner that is reasonable and appropriate to meet the day-to-day requirements of the Hospital and in accordance with local industry standards applicable to similarly situated hospitals. In the absence of oral or written direction by the Trustee, the Manager shall be expected to exercise reasonable judgment in the provision of the Management Services.

C. At all times and in every instance, the Manager's performance shall be subject to review and approval by the Trustee (and, to the extent necessary, the Bankruptcy Court).

D. The Manager shall use its best efforts and take all reasonable actions, subject to the provisions of this Agreement and applicable budgetary limitations and other limitations set out by the Bankruptcy Court, to operate the Hospital profitably, in an efficient, orderly, and safe manner.

E. In performing its duties, the Manager may reasonably rely on information, opinions, reports, or statements, including financial statements and other financial data, prepared or presented by:

      i. The Trustee or its agents;

     ii. Legal, accounting, or other professional advisors; or

    iii. Other persons as to matters the Manager believes to be within such person's professional or expert competence.

F. Unless expressly provided otherwise by this Agreement, the Manager shall have full authority to conduct, supervise, and manage the entirety of the day-to-day operations of the Hospital, including, without limitation, provision of the Management Services, without first obtaining prior consultations or approvals from the Owner, subject to any conditions imposed by the Trustee.

G. It is expressly agreed by the Parties that so long as this Agreement is in effect, the Owner shall not interfere with the day-to-day operations of the Hospital by the Manager and shall at no time give or communicate orders or instructions to employees or personnel subject to the Manager's direction under this Agreement except as otherwise provided in this Agreement.

H. Notwithstanding anything herein to the contrary, the Trustee shall have at all times full and final decision-making authority and control over the business, affairs, and operations of the Hospital, and all actions and activities of the Manager shall be subject to the directions of the Trustee (and, to the extent necessary, orders of the Bankruptcy Court).

I. The Owner acknowledges that the Manager has not made and will not make any express or implied warranties or representations that the services provided by the Manager will result in any particular amount or level of revenue or income to the Owner. Further, the Manager does not guaranty any outcomes for the patients of the Hospital.

J. Nothing in this Agreement is intended or shall be construed to allow the Manager to exercise control or direction over the manner or method by which any licensed medical professional provides medical services. The rendition of all such services, including the prescription or administration of medicine and drugs, shall be the sole responsibility of the appropriate licensed medical professional.

K. During the term of this Agreement, the Owner agrees that it will not enter into any agreement with any other person or entity to provide the same or similar services to be provided by Manager hereunder.

L. The Manager may provide its services through agreements with its parent company, with affiliates, or with sister organizations. The cost of any such arrangement is included in the management fee and no additional expense shall be incurred by the Owner without the Owner's express consent.

M. The Manager will manage cash collateral/debtor-in-possession lending to Court-approved budgets. The Trustee shall obtain the Bankruptcy Court's approval for any budget variance that exceeds fifteen percent (15%).

Section 4. Non-Solicitation.

A. To the maximum extent not prohibited by Law, during the term of this Agreement, neither the Owner, any Affiliate of the Owner, nor any person or entity with the Owner's assistance, shall, directly or indirectly:
  1. Take any action to induce any employee to quit the employment of the Manager or an Affiliate of the Manager;
  2. Employ or otherwise engage any person who is or was an employee of the Manager or an Affiliate of the Manager; or
  3. Induce any other person or entity to take any action to induce any employee of the Manager or an Affiliate of the Manager to terminate his or her employment.

B. The Owner acknowledges and agrees that this Section 4 is reasonable and necessary to protect and preserve the Manager's legitimate business interest and to prevent any unfair advantage conferred on the Owner.

C. The Owner acknowledges and agrees that any breach of this Section 5 will result in irreparable injury and damage to the Manager not adequately compensable in monetary damages alone.  Accordingly, the Owner hereby agrees that, in the event of such a breach, other than as specifically provided for in this Agreement or in another written agreement between the Parties, the Manager shall be entitled to preliminary and permanent injunctive relief and other equitable relief as granted by any court of competent jurisdiction.

## ARTICLE III – COMPENSATION

Section 5. Management Fee.

A. In consideration of the Manager's performance of its services under this Agreement, the Owner shall pay the Manager a Management Fee of $225,000 per month, which shall be paid as follows: $40,000 on or before the 1st of each month (to be prorated during the month of the Effective Date with such prorated amount being paid within three (3) days of the Effective Date) and the remainder to be paid from the Hospital's receipt of the components of the Management Fee from whatever source received.
B. In addition to the Management Fee, the Owner shall pay the Manager for staffing services related to Non-Executive Personnel at cost plus twenty percent (20%).
C. In addition to the Management Fee, the Owner shall pay the Manager for revenue operation services at 7 percent (7%) of the Hospital's receipts.  Such revenue operation services shall include billing and collecting all revenues, rents, fees, and other charges from Hospital patients or the applicable third-party payors, including Medicare and Medicaid.
D. The Manager shall perform appropriate time studies and use other efforts to identify and categorize allowable costs for the purposes of Medicare cost reporting.

Section 6. No Performance Fee.

A. The Parties intend for the Management Fee payable under this Agreement to reflect the reasonable value of the Manager's services, considering the nature and extent of the services required, the terms of this Agreement, and the risk assumed by the Manager.
B. Nothing in this Agreement nor any other written or oral agreement between the Owner and the Manager contemplates or requires the referral of any patients or business to the Hospital and no compensation or remuneration of any kind whatsoever payable under this Agreement shall be contingent upon the referral of patients or business to the Hospital by the Manager or its Affiliates. The compensation payable under this Agreement is based solely on the services to be provided by the Manager under this Agreement.

Section 7. Reimbursement of Expenses.
A. The Owner shall reimburse the Manager for Reimbursable Expenses.  Reimbursable Expenses shall be without mark-up or profit added to such actual expenses.
B. The Manager shall present appropriate bills or vouchers reflecting the name of the person or persons incurring the expense, the amount and date thereof, and the purpose

or purposes for the expenditure to the Owner for payment. The Owner shall provide such reimbursement within fifteen (15) days of receipt of appropriate bills or vouchers.

C. If the Manager identifies a service, product, or consultation necessary for hospital operations but which is outside the scope of its identified management services, it shall present the matter to the Trustee for approval before incurring the expense. Examples include preparing and consulting on the cost report, external audits, etc.

D. The Parties recognize issues may arise which require additional or more intense services from the Manager; in such event the parties may agree to additional reimbursement. As an example, if Owner decides to construct – new facility it may ask Manager to work with the planning and financing of the project.

## ARTICLE IV – TERM AND TERMINATION

Section 8. Term.        The term of this Agreement is for a period of five (5) years commencing upon approval of this Agreement by the Bankruptcy Court. This Agreement will automatically renew for a new five (5) year period unless either Party provides the other Party written notice of that Party's intention not to extend this Agreement at least 180 days prior to the end of the initial five-year term or any subsequent five-year term.

Section 9. Termination.

A. This Agreement may be terminated by any of the following events:
   1. By the Trustee.  By the Trustee for any reason upon providing 30 days' prior written notice to the Manager.
   2. Automatic Termination.  This Agreement shall automatically terminate, unless the Trustee in its sole discretion elects not to terminate the Agreement, should the Manager (a) file a petition in bankruptcy; (b) make an assignment for the benefit of creditors; (c) consent to the appointment of a receiver of itself; or (d) file a petition or answer seeking reorganization or arrangement under any applicable Law.
   3. By the Manager without cause upon thirty (30) days' prior written notice to the Trustee;
   4. By order of the Bankruptcy Court; or
   5. By either the Trustee or the Manager upon Default of this Agreement upon providing the defaulting Party with written notice of such Default at least thirty (30) days prior to the Termination Date, provided, the defaulting Party may cure such Default to the reasonable satisfaction of the other Party within thirty (30) days after receipt of such notice.

B. The following events shall each constitute a "Default" under this Agreement:
   1. The hospital license required for the operation of the Hospital is at any time suspended, terminated or revoked due to the actions or inactions of a Party, and such suspension, termination, or revocation continues in effect for a period of thirty (30) consecutive days;
   2. The Manager or any director, officer, manager, or equity owner of the Manager, or any Affiliate of the Manager is sanctioned by Medicare or Medicaid, or the Hospital is sanctioned by Medicare or Medicaid due to the actions or inactions of the Manager; or the Manager fails to maintain the hospital license of the

Hospital in good standing; or the Manager fails to maintain the accreditation of the Hospital with The Joint Commission or a comparable organization (if applicable);

3. The Owner fails to pay the Manager the Management Fee within ten (10) days after receipt of written notice from the Manager that such payment is delinquent; or

4. Any breach by either Party of the material covenants, conditions or obligations of this Agreement in any material respect.

5. The creation or existence of a Jeopardy Issue.

C. Upon termination of this Agreement for any reason:

1. The Manager shall promptly discontinue the performance of all services hereunder;

2. The Owner shall promptly pay the Manager all fees due the Manager up to the Termination Date, subject to proration if the Term ends other than at the end of a month; and

3. Without any further action on the part of the Manager or the Owner, the Owner shall assume, all obligations arising after the Termination Date under any agreements entered into by the Manager in the furtherance of its duties hereunder.

D. Any obligation of the Parties that are specifically intended to survive expiration or termination of this Agreement shall survive expiration or termination hereof.

## ARTICLE V – OPERATIONS

Section 10. Consultation and Communication.   The Manager agrees to consult and communicate with the Trustee (and, to the extent necessary, the Bankruptcy Court, through the Manager's Executive Personnel, from time to time (and at any time at the Trustee's request) regarding the Manager's provision of services under this Agreement.  It is expected the Manager will participate in meetings or other court proceedings pending before the Bankruptcy Court if so requested by the Trustee.

Section 11. Executive Personnel.

A. As part of the Management Services, the Manager shall be responsible for selecting, at the Manager's sole expense but with the Trustee's approval, the number, function, qualifications, and compensation, including salary and benefits, of the Executive Personnel and shall control the terms and conditions of such engagement or employment relating to such Executive Personnel, including hiring, training, promotion, discharge, and work duties.

B. All Executive Personnel engaged or hired by the Manager in the performance of its duties hereunder shall be direct employees, agents, or independent contractors of the Manager, and not of the Owner or Trustee.  Such Executive Personnel shall be assigned by the Manager to the Hospital as part of the Management Fee.  The Manager shall be solely responsible for the payment of wages or compensation to Executive Personnel, and for the payment of any unemployment compensation, workers' compensation, F.I.C.A, and other payroll taxes, assessments, interest and penalties of any kind assessed by any governmental agency that pertains to monies earned, collected, paid or

charged to Manager, its employees or other agents, and the Manager shall defend, indemnify, and hold the Trustee harmless with respect to any such liability.

C. If the Trustee is dissatisfied with the performance of any Executive Personnel assigned by the Manager to the Hospital, the Parties agree to engage in good faith discussions and the use of commercially reasonable efforts to attempt to resolve the matter to the mutual satisfaction of the Parties. In the event the Parties are unable to resolve the matter, the Manager shall terminate or reassign such Executive Personnel upon the reasonable request of the Trustee.

D. The Executive Personnel shall include at least an individual with appropriate education and experience to serve as a full-time chief executive officer or administrator for the Hospital. The administrator shall be responsible for on-site day-to-day services provided by the Manager under this Agreement, including supervision of other Executive Personnel.

Section 12. Operating Budget.

A. The Manager shall negotiate with pre-bankruptcy petition vendors regarding continued services, but the Manager cannot pay any pre-petition claims of such vendors without the approval of the Bankruptcy Court.

B. To the extent modifications to the Bankruptcy Court's approved budgets are necessary, the Trustee will use best efforts to request Bankruptcy Court approval of necessary monetary items.

C. In addition to any other Manager-created budgets for Hospital operations requested by the Trustee and/or required by the Bankruptcy Court, at least ninety (90) days prior to the commencement of each Operating Year, the Manager shall prepare and submit to the Owner its proposed Annual Budget for such year. The Annual Budget shall include the Manager's good faith projection of revenues, Operating Expenses, and Capital Expenditures, presented on an annual basis, for the upcoming Operating Year. The Owner agrees to provide the Manager with all information in its possession necessary to enable the Manager to prepare the budget.

D. The Annual Budget shall be subject to the review and approval of the Trustee, provided such approval shall not be unreasonably withheld or delayed. In order for the Trustee to fully evaluate and analyze such budget proposal, the Manager agrees to provide to the Owner such reasonable financial information related to the services performed under this Agreement as may be requested by the Owner from time to time.

E. If the Owner fails to approve any Annual Budget proposed by the Manager, the Owner shall promptly provide the Manager the specific reasons therefor and its suggested modification to the Manager's proposed Annual Budget in order to make it acceptable. In such an event, the Parties agree to engage in good faith discussions and the use of commercially reasonably efforts to attempt to resolve the matter to the mutual satisfaction of the Parties.

F. In the event the Owner fails, for whatever reason, to approve an Annual Budget prior to the commencement of the Operating Year for such the Annual Budget was submitted, the aggregate amount of Operating Expenses and Capital Expenditures reflected in the approved Annual Budget for the preceding Operating Year shall remain in effect until such time as a new Annual Budget has been approved.

G. The Manager shall use all reasonable efforts to provide the services under this Agreement in accordance with the Bankruptcy Court's approved budget. However, the Owner acknowledges that, notwithstanding the Manager's expertise and expertise in relation to the provision of services under this Agreement, the projections contained in any Bankruptcy Court approved budget are subject to and may be affected by changes in financial, economic, and other conditions and circumstances beyond the Manager's control, and that the Manager shall have no independent liability if the numbers within the Bankruptcy Court's approved budget are not achieved.

Section 13. Flow of Funds.

A. The flow of funds received and disbursed in connection with the operation of the Hospital shall be conducted and controlled as provided for in this Section 13.
1. The Owner, through the Trustee, shall establish account(s) for the receipt of payments for healthcare services.
2. The account(s) established for the receipt of electronically submitted receivables shall be under the sole dominion and control of the Owner.
3. The Owner, in collaboration with the Manager, shall establish the process through which receipts shall be deposited.
4. The Owner shall establish such Operating Accounts as the Owner and Manager mutually agree are necessary for the efficient operation of the Hospital. All Operating Accounts shall be established in the Owner's name at banks or other financial institutions determined by the Owner.
5. The Owner shall, in its sole discretion, determine the individuals who will be authorized to draw upon Operating Accounts.
6. In no event shall amounts deposited in any Operating Accounts be considered the funds of the Manager or commingled with any other funds of the Manager.
7. The Parties will agree on a procedure for the efficient transfer of funds to the Operating Accounts.
8. Disbursements from Operating Accounts shall be made by the Owner in accordance with its own procedures, provided, the Parties specifically agree that any amounts required to be expended under this Agreement shall be done at the expense of and on the account of the Owner.
9. The Parties specifically agree the Owner shall have sole authority to sign checks and make withdrawals from Operating Accounts without needing to obtain the co-signature of a representative of the Manager. The Owner acknowledges that it would be difficult, if not impossible, for the Manager to perform its duties under this Agreement in a timely and efficient manner in the event the Owner does not timely make required disbursements from Operating Accounts.

B. The Manager shall have no liability to the Owner or any third party in the event the Manager is unable to perform its obligations hereunder, or under any third party Agreement entered into pursuant to the term of this Agreement, due to the fact sufficient funds are not made available by the Owner to the Manager to pay such expenses in a timely manner. The Owner shall hold the Manager harmless in the event the Manager is unable to perform its obligations hereunder, or under any third-party Agreement entered into pursuant to the terms of this Agreement, due to the Owner's failure to make sufficient funds available to the Manager.

C. Under no circumstances shall the Manager be expected or required to pay for or advance any of its own funds to pay for any Operating Expense or Capital Expenditure of the Entities unless otherwise agreed in writing by the Parties.

Section 14. Insurance.

A. During the term of this Agreement, the Manager shall continuously maintain general liability, directors' and officers' liability, workers' compensation insurance, and professional liability insurance in amounts customary in the industry as mutually agreed by the Trustee and the Manager.  Such insurance shall name the Trustee and Owner as additional insureds, and the policies of insurance shall provide that the insurance coverage may not be modified or cancelled without giving the Trustee at least thirty (30) days' prior written notice.  Upon request, the Manager shall provide a certificate of insurance to the Trustee evidencing such coverage and shall notify the Trustee immediately if any adverse change in coverage occurs for any reason.

Section 15. Indemnification.

A. The Owner shall indemnify and hold harmless the Manager and its employees and Affiliates from and against any and all liability, including reasonable attorneys' fees, that may arise out of any negligence or intentional acts or omissions of the Owner or any officer or employee of the Owner, except to the extent that any such liabilities arise or result from a breach of this Agreement by the Manager or the negligence, willful misconduct, or bad faith of the Manager.  Moreover, the Manager shall not, by entering into and performing this Agreement, become liable for the debts and obligations of the Owner.

B. The Manager shall indemnify and hold harmless the Trustee and its employees and Affiliates from and against any and all liability, including reasonable attorneys' fees, that may arise out of the negligent or intentional acts or omissions of the Manager or any officer or employee of the Manager, except to the extent that any such liabilities arise or result from an act or omission or breach of this Agreement by the Trustee or the negligence, willful misconduct, or bad faith of the Trustee or arise from actions taken by the Manager at the direction of the Trustee.

C. This Section 15 shall survive termination of this Agreement.

Section 16. Confidentiality.

A. The Trustee shall provide the Manager with all data, information, reports and documentation in its possession or available to it that is necessary to enable the Manager to carry out its duties and obligations under this Agreement.

B. Each Party agrees, both during the term of this Agreement and after termination, to hold the other Party's Confidential Information in strict confidence. Each Party agrees not to permit the other Party's Confidential Information to become available in any form to any third party or to use the other Party's Confidential Information for any purpose other than for the purposes of this Agreement. The receiving Party shall take all reasonable steps to ensure that Confidential Information of the disclosing Party is

not disclosed or distributed by the receiving Party's employees, agents or consultants in violation of the provisions of this Agreement.

C. Each Party acknowledges that any use or disclosure of the other Party's Confidential Information other than as specifically provided for in this Agreement will result in irreparable injury and damage to the disclosing Party not adequately compensable in monetary damages alone. Accordingly, each Party hereby agrees that, in the event of use or disclosure by the receiving Party of the disclosing Party's Confidential Information, other than as specifically provided for in this Agreement or in another written agreement between the Parties, the disclosing Party shall be entitled to preliminary and permanent injunctive relief and other equitable relief as granted by any court of competent jurisdiction.

D. Each Party agrees to destroy or turn over to the other Party all Confidential Information in its possession relating to the other Party within thirty (30) days following the Termination Date. If destruction or return is not reasonably possible, such Party shall continue to maintain, for a period of five (5) years, the Confidential Information in strict confidence and shall not make such Confidential Information available in any form to any third party or to use such Confidential Information for any purpose.

E. Each Party acknowledges that it obtains no ownership rights whatsoever in the Confidential Information of the other Party and, upon termination of this Agreement, each Party shall retain all rights to its Confidential Information.

F. The Manager and the Owner agree to comply with the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and the regulations promulgated pursuant thereto by the United States Department of Health and Human Services, including, without limitation, entering into a Business Associate Agreement in a form acceptable to the Parties.

G. Nothing in this Agreement shall prohibit any disclosure of Confidential Information by the receiving Party when disclosure is required by applicable Law or the Bankruptcy Court, but only to the extent so required. The receiving Party shall inform the disclosing Party of the requirement and shall cooperate with the disclosing Party in obtaining a protective order and other reasonable protections for the Confidential Information subject to disclosure.

H. This Section 16 shall survive termination of this Agreement.

Section 17. Access to Information.

A. The Manager and each of the Manager's Affiliates will allow the Comptroller General of the United States, the Secretary of the United States Department of Health and Human Services, officials administering the North Carolina Medicaid program and their duly authorized representatives, access to this Agreement and their books, documents, and records necessary to verify the nature and extent of the cost of providing services under this Agreement until the expiration of four (4) years after the services are provided under this Agreement. Such access will be provided in accordance with Subpart D of Title 42 of the Code of Federal Regulations and regulations issued pursuant to Section 1861 of the federal Social Security Act.

B. If the Manager carries out any of its obligations under this Agreement under a subcontract where the value of services by, or payments to be made to, a subcontractor which is an Affiliate of the Manager is Ten Thousand Dollars ($10,000.00) or more,

the Manager agrees to include a requirement similar to that contained in this Section 18 in any such subcontract.

C. No attorney-client, accountant-client or other privilege shall be deemed to have been waived by the Owner, the Trustee, or the Manager by this provision.

Section 18. Jeopardy Issue.

A. Notwithstanding anything herein to the contrary, in the event this Agreement or the performance by any Party hereto of any term, covenant, condition or provision of this Agreement is likely to expose a party or its affiliates to a material risk of a Jeopardy Issue, then either Party may give written notice of the Jeopardy Issue to the other Party.

B. The Parties shall immediately initiate negotiations to resolve the Jeopardy Issue through amendments to this Agreement or other corrective action over a period of up to sixty (60) days following receipt of the written notice in order to resolve the Jeopardy Issue with the objective of agreeing upon a resolution that minimizes, to the extent reasonably practicable, any adverse impact on any Party.

C. If the Parties are unable to agree upon an amendment or other corrective action to resolve the Jeopardy Issue by the end of the sixty (60) day negotiation process, then either Party may, at its option, terminate this Agreement.

Section 19. Clinical Site.       The Trustee agrees that the Manager may, upon reasonable schedule, bring prospective new clients to observe the services the Manager has provided to the Trustee.

## ARTICLE VI – REPRESENTATIONS AND COVENANTS

Section 20. Manager's Representations and Covenants.  The Manager hereby represents and covenants to the Trustee as follows, which such representations and covenants shall, unless otherwise stated herein, survive the execution and delivery of this Agreement:

A. The Manager is a limited liability company duly organized, validity existing, and in good standing under the laws of the State of Oklahoma.

B. It has the full legal right, power, and authority to enter into this Agreement and to grant the rights and perform the obligations of the Manager herein, and that no other third-party consent or approval is required to grant such rights or perform such obligations hereunder.

C. This Agreement has been duly executed and delivered by the Manager and constitutes a valid and binding obligation of the Manager, enforceable in accordance with its terms, except as such enforceability be limited by bankruptcy, insolvency, reorganization, or similar laws affecting creditors' rights generally or by general equitable principles.

D. To the knowledge of the Manager, neither the execution and delivery of this Agreement by the Manager nor Manager's performance of any obligation hereunder:

   1. Will constitute a violation of any Law to which the Manager is subject;

   2. Shall constitute a default of any term or provision or shall cause an acceleration of the performance required, under any other agreement or document to which the Manager is a party or otherwise found.

E.  Neither the Manager nor any of its owners and/or employees are excluded from participation in any Federal Health Care Program and to its knowledge, there are no pending or threatened governmental investigations that may lead to such exclusion. The Manager shall notify the Trustee of the commencement of any such exclusion or investigation within seven (7) days of first learning of it.

F.  If necessary to carry out the intent of the Agreement, the Manager agrees to execute and provide to the Trustee, on or after the Effective Date, any and all other instruments, documents, conveyances, assignments, and agreements which the Trustee may reasonable request in connection with the provision of services under this Agreement.

## ARTICLE VII – GENERAL PROVISIONS

Section 21. No Discrimination.  The Manager agrees it will not discriminate against any employee or applicant for employment for work under this Agreement because of race, religion, color, sex, disability, national origin, ancestry, physical handicap, or age, and will take affirmative steps to ensure applicants are employed, and employees are treated during employment, without regard for race, religion, color, sex, disability, national origin, ancestry, physical handicap, or age.

Section 22. Force Majeure.  Neither Party shall be liable or responsible to the other Party for any delay, loss, damage, failure, or inability to perform under this Agreement due to an Event of Force Majeure, provided that the Party claiming failure or inability to perform provides written notice to the other Party within thirty (30) days of the date on which such Party gains actual knowledge of such Event of Force Majeure. Notwithstanding the foregoing, in no event shall a Party's failure to make payments due hereunder be excusable due to an Event of Force Majeure.

Section 23. Assignment.  This Agreement may not be assigned or delegated by the Manager without the consent of the Trustee.  The Trustee may assign its rights and obligations hereunder without the consent of the Manager, provided that such assignment has been approved by the Bankruptcy Court.

Section 24. Notices.  All notice required or permitted to be given pursuant to this Agreement shall be in writing and delivered personally or sent by registered or certified mail, return receipt requested, to the address and positions set forth below. All such notices to either Party shall be deemed to be have been provided when delivered, if delivered personally, or three (3) days after mailed, if sent by registered or certified mail.

If to the Owner:            Thomas W. Waldrep, Jr., Trustee of the Owner
                            Waldrep LLP
                            101 S. Stratford Rd., Suite 210
                            Winston-Salem, NC 27101

If to the Manager:          Barry L. Smith
                            McAffe & Taft, a Professional Corporation
                            Williams Center Tower II
                            Two W. Second Street, Suite 1100
                            Tulsa, OK 74103

The designation of the positions to be notified and the addresses of such Parties set forth above may be changed from time to time by written notice to the other Party in the manner set forth above.

Section 25. Severability.    If a court of competent jurisdiction determines that any term of this Agreement is invalid or unenforceable to any extent under applicable law, the remainder of this Agreement, and the application of this Agreement to other circumstances, shall not be affected thereby, and each remaining term shall be valid and enforceable to the fullest extent permitted by law.

Section 26. Governing Law.  This Agreement is entered into under and pursuant to, and is to be construed and enforceable in accordance with, the laws of the State of North Carolina, without regard to its conflict of laws principles.

Section 27. Reasonable Actions Required.    Notwithstanding any provision of this Agreement to the contrary, the Manager agrees to perform all acts reasonably necessary to ensure the Owner's compliance with any and all laws related to the accounting, reporting, recording, and retention of all revenues and expenditures of public funds.

Section 28. Amendments.    Neither this Agreement nor any of its terms may be changed or modified, waived, or terminated, unless as otherwise provided for herein, except by an instrument in writing signed by an authorized representative of the Party against whom the enforcement of the change, waiver, or termination is sought.

Section 29. Waiver and Remedies.

A. No failure or delay by a Party hereto to insist on the strict performance of any term of this Agreement, or to exercise any right or remedy consequent to a breach thereof, shall constitute a waiver of any breach or any subsequent breach of such term. No waiver of any breach hereunder shall affect or alter the remaining terms of this Agreement, but each and every term of this Agreement shall continue in full force and effect with respect to any other then existing or subsequence breach thereof.
B. The remedies provided in this Agreement are cumulative and not exclusive of the remedies provided by law or in equity. Every remedy given by this Agreement may be exercised from time to time and as often as may be deemed expedient by the Party exercising such remedy.

Section 30. Relationship of Parties.    The Manager is providing services as an independent contractor.  The Manager and Owner shall not by virtue of this Agreement be deemed to be creating a joint venture, partnership, agency, or employment relationship in the operation of the Hospital or otherwise.  The Manager may not bind the Owner or incur obligations on behalf of the Owner, except as specifically provided for in this Agreement.

Section 31. No Third-Party Beneficiaries.  There are no intended third-party beneficiaries under this Agreement, and no third-party shall have any rights or make any claim thereunder, it being intended that solely the Parties hereto shall have rights and may make claims hereunder.

Section 32. Headings.  All headings, subheadings, and captions employed within this Agreement and in the accompanying schedules and exhibits are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

Section 33. Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same document. This Agreement may be executed by the Parties and transmitted by facsimile or electronic transmission and if so executed and transmitted, shall be effective as if the Parties had delivered and executed original of this Agreement.

Section 34. Benefits and Obligations.  The covenants and agreements contained herein shall inure to the benefit of, and be binding upon, the Parties hereto and their respective successors and assigns.

Section 35. Time.  Time is of the essence with respect to all payments under this Agreement.

Section 36. Exercise of Discretion.  Whenever this Agreement requires any consent or approval to be given by either Party, or either Party must or may exercise discretion, and except where specifically set forth to the contrary, the Parties agree that such consent or approval shall not be unreasonably withheld or delayed, and that such discretion shall be reasonably exercised.

Section 40. Acknowledgement.  The Parties acknowledge that they have been provided with a copy of this Agreement for review prior to signing it, that they have been given the opportunity to review it prior to signing it, that they have been given the opportunity to have this Agreement reviewed by their respective attorneys prior to signing it, and that they understanding the purpose and effect of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be executed on behalf of such Party by an authorized representative.

| CAH Acquisition Company 16, LLC, a Delaware limited liability company | Cohesive Healthcare Management & Consulting, LLC, an Oklahoma limited liability company |
|---|---|
| By: _____ | By: _____ |
| Name: Thomas W. Waldrep, Jr. | Name: Kathy Hammons |
| Title: Trustee | Title: President/Chief Executive Officer |

**Exhibit A**

<u>Description of Management Services</u>:

a.  The Manager shall perform the duties set forth below and all other duties that are typical and customary for a manager of an acute general medical and surgical hospital and shall do so in accordance with a standard of care, skill, and diligence as is required by applicable Federal and State laws and regulations; <u>provided, however</u>, that the Trustee shall maintain complete and total control over the Hospital's business affairs given the bankrupt nature of the Owner.  Without the prior written consent of the Trustee, the Manager shall not have the authority to enter into any contract or incur any debt or liability in the name of or on behalf of the Owner or Trustee; to enter into any contract or other agreement inconsistent with the terms of the Management Agreement or that may have a durational Term that extends beyond the term of the Agreement; or to borrow money in the name or on behalf of the Owner or Trustee.

b.  During the Term of this Agreement, the Manager shall assist Trustee and Owner in connection with the operation of the Hospital by providing the following management-related services:

  i.  Hire and discharge Executive and Non-Executive Hospital Personnel, including physicians, physician assistants, nurse practitioners, registered nurses, care aides, and office and other employees, in accordance with all applicable laws, rules, regulations, and standards that govern the Hospital's operations;

  ii.  Supervise determinations of eligibility of individuals for health care coverage;

  iii.  Manage the marketing and public relations on behalf of the Hospital;

  iv.  Manage provider and payor contracts as necessary for the operation of the Hospital;

  v.  Maintain accounting, billing, and patient records (including medical, financial, and collection records, whether in hard copy or EHR format);

  vi.  Prepare Medicare and Medicaid Cost Reports;

  vii.  Administer Hospital's computerized physician order entries, clinical service records, and other information technology systems;

  viii.  Arrange for contracts for vendor services for the Hospital;

  ix.  Maintain accounting records, systems and internal controls consistent and in accordance with all applicable government regulations;

    x.  Pay when due, after obtaining Trustee's prior written consent, the cost of those third-party services necessary for Manager to carry out the management of Hospital, together with ordinary and necessary management expenses of Hospital, including, but not limited to:

        1.  The cost of all supplies and equipment necessary to provide care and services to the patients of Hospital;

        2.  Insurance premiums and related charges for required insurance;

        3.  All taxes, including real estate taxes, tangible property taxes, and sales taxes;

        4.  Any other expense reasonably incurred in the operation of Hospital an acute general medical and surgical hospital.

c.    <u>Maintenance of Hospital</u>: The Manager shall manage and maintain the Hospital, including furniture, fixtures, furnishings, equipment, and other property, in the same condition and repair as originally found, normal wear and tear excepted.

d.    <u>Rates and Charges</u>: The Manager shall advise the Trustee with respect to rates and fees for the services furnished at the Hospital consistent with any applicable government regulations.

e.    <u>Use and Operation of Hospital</u>: The Hospital shall be used and operated as an acute general medical and surgical hospital. The Hospital and its staff shall provide care and services to patients in a manner consistent with said use and operation and for no other purpose without the Trustee's prior written consent.

f.    <u>Reports</u>: The Manager shall keep the Trustee informed as to the general operating condition and management status of the Hospital and shall provide the Trustee with regular and timely written management reports,  as may be needed to ensure that the Hospital maintains compliance with all applicable Federal and State laws and regulations, any formal action taken or requests made by any regulatory agency, any relevant Bankruptcy Case proceedings, including monthly operating reports in accordance with the applicable bankruptcy procedures,  and any Order or other ruling issued by the Bankruptcy Court with respect to the Bankruptcy Case of Owner. Further, the Manager shall timely respond to any *ad-hoc* or emergency request made by the Trustee for a written report or other information, including monthly operating reports.